Good morning, your honors. May it please the court, my name is Charles Cooper. I represent the Appellants Petitioners. And we are grateful for this opportunity to bring forward our motion. That's only because you like California and it's not as cold and wet there. Your honor, this is a welcome respite. I should like to reserve five minutes of my time if possible for rebuttal. And your honors, I'd first like to address a couple of points concerning the court's jurisdiction. A couple of points that were mentioned or at least highlighted in the papers that the plaintiffs filed yesterday. And I would like to refer to my clients as the proponents for simplicity and consistency. As you say, this court has a very rich and consistent body of case law under both the collateral order doctrine and its mandamus jurisdiction. Exercising interlocutory review of discovery disputes dealing with privileges. Your honor, the plaintiffs have highlighted the pending case Mohawk. The Mohawk case pending now in the United States Supreme Court. And their point is that if the court in that case eliminates collateral order doctrine review to the common law and may say absolute privilege, attorney-client privilege, then it follows that it will have to be eliminated in the context of the First Amendment privilege that we are asserting here. We do not think that follows at all for two reasons. First of all, the privilege we assert here is of constitutional dimension. And the constitutional issues that we raise and the constitutional freedoms of expressive and associational rights. It seems to me that if I understand the framework of this case at this point, the plaintiffs have agreed not to seek the names of members of the organization. And I think, have they agreed to redaction also of names that are in the material that you're giving them? That you would be required to give them? Your honor, we've been talking about a protective order that would protect the identity. Okay. So, I could see a difference in the First Amendment context if the concern was immediate harassment or violence, for example, or something that the exposure of individuals would require. But that's kind of off the table here now. So, isn't the variety of First Amendment privilege that you're now talking about really quite similar to the attorney-client privilege? I.e., the disclosure that you're concerned about really is a chilling effect on future relationships, not on this one. Your honor, it's two things. First of all, the disclosure that we're concerned about would be a here and now infringement on the First Amendment freedoms of my clients. But only because of a possible chilling effect, right? No, your honor. No, your honor. It's our view, and we believe McIntyre makes this clear, that the First Amendment protects at its highest level of protection, not only a political speech in the heat, as McIntyre put it, of a referendum election. The speech that speakers elect to say. But it protects as well the speech that they elect not to say. No, but that's not the question. The question is, whatever chilling effect or harm befalls your clients, the chilling effect can only be prospective. That's the nature of the affidavits that you file. They would change their behavior in the future. We're here at the outset of trial. The harm issue, which is what Judge Berzon was directing you to, is whether or not the disclosure would have some now impact on your clients. And Judge Walker was expressed in dealing with that, saying that there wouldn't be, if anything, it's cumulative. And secondly, the protective order would be imposed to curtail it. So what is the urgency of the First Amendment issue for you that is going to require intervention at the outset of trial instead of after the fact? Your Honor, we are not arguing that, in light of the protective order issue, that we face the prospect of additional harassment, even though we believe that to be true. But we do face the here and now prospect of an infringement on our First Amendment rights. That may be right, but why can't you argue that at the end of the trial? Why do we have to get into that now? Because, Your Honor, at the moment that this internal political debate and communication is disclosed to our adversaries, at that very moment, our First Amendment rights have been infringed.  How? That means, if this Court were at the end of the case to say that, yes, there is a First Amendment privilege, it was misapplied, in this case, it would be corrected on appeal, and the chilling effect would be eliminated by vindication of your claim of First Amendment privilege. Why does it have to? What is the immediacy today? Because, Your Honor, we have a right, a First Amendment right, not to say and not to disclose that which we held private and confidential. You're begging the question. You're just begging the question. No, well, Your Honor, if that's what... I'm asking you, I'm not saying you can't establish the right. The question is when. This is a motions panel, not a merits panel at the moment. The question is, do we intervene in the trial process? What is the basis? You started out with saying this was even more urgent than an attorney-client privilege should the Mohawk decision come down, so even the attorney-client privilege may not be subject to collateral order review. For the same reason that once confidential information in an attorney-client privilege context is disclosed and the cat is out of the bag, that is in itself a violation of attorney-client privilege. So my concern is really why this case doesn't at least stand and fall with Mohawk with regard to the collateral order. In other words, I'm not suggesting that you're in worse shape than Mohawk, but I know, and under our case law, the attorney-client privilege, as I understand it, can be vindicated on collateral appeal. That's right. But if we have this sort of specter over our heads, which is this pending Supreme Court case, and what I want to know is why you're any better off than people claiming attorney-client privilege, and that I'm not seeing. Well, Your Honor, once again, I think we're better off for two reasons, and let me move to my second reason, which is that the principal concern with respect to collateral order appeals of attorney-client privilege claims and discovery disputes is that they're ubiquitous. They take place in almost every case, and the finality rule is being slowly eroded, and that is the consideration that is uppermost in that case. That would not apply at all here. The First Amendment privilege we're asserting is very rarely in play, as the paucity, honestly, of the cases that deal with this First Amendment privilege reflect. As the appellees point out, there isn't any case from the appellate courts in which this privilege has been in play. So for that reason, Your Honor, we don't think that an adverse ruling to the attorney-client privilege would necessarily mean that a First Amendment privilege, one of constitutional dimension, would be foreclosed. But even if it would, this Court clearly has a rich body of case law, acknowledging that its mandamus jurisdiction is available in this very kind of situation. And, in fact, the parties that are— So are you arguing that this is a proper collateral order appeal, or that this is an appropriate context for issuance of a writ of mandamus? Arguing both—making both arguments, Your Honor, that this Court has jurisdiction to review this claim of First Amendment privilege under both of its jurisdictions. And, in the Moloch case, the parties who are arguing against use of the collateral order doctrine for attorney-client privilege are making clear that this would not foreclose appellate review of important or novel claims of privilege because the mandamus authority would always be available. And this Court has, on a number of occasions, exercised its mandamus authority in this case. But mandamus applies where it's clearly erroneous ruling by the district court. And here there's no really—there's no law that's directly on its point. So I don't see how we could say that the district court clearly erred. Your Honor, I guess that's where we disagree. We think that the district court clearly erred, that we have a very strong likelihood of succeeding on our basic proposition that the internal, private, confidential communications and debates among the proponents and their agents are protected by the First Amendment, and that this is the highest— I've got a scope question. As I understand the request, it's not for internal communications among—within the organization, that you represent, but only with regard to communications with third parties. Is that true? No, Your Honor. It's within the campaign. But the third party—but not within the organization itself. In other words, the word third party definitely appears in the request. And I therefore understand that it applies, for example, to communications with the campaign consultants and the advertising consultants and so on, but not to internal communications among members of the campaign. Is that—of the organization that you represent. Is that not true? No, that's not true. Why is that? Why is that not true? No, I—well, maybe I'm not following your question, but our claim of First Amendment— I know what your claim is, but what is the discovery request? Well, the request was narrowed by the—I mean, it was altered during the course of the two orders. It has been. We've litigated this quite a bit in the final court. So what are we looking at? That's the question I have. Are we looking at the November 11th order now? Is that, for all practical purposes, that is the order that you are seeking? As well as the October 1 order, both of those orders, and they're quite consistent with one another, and they do narrow the scope of the discovery quite significantly. We— How is the October 1 order final? I can understand where there might be some argument the November 11 order is final, but for the collateral order review, we have to have a definitive decision. On October 1, Judge Walker said you have narrowed—it hasn't been narrowed down, and you haven't provided sufficient authority. And then, as applied in the November 11 screening, it appears that he has come to some conclusion about the scope of the First Amendment privilege. Yes, Your Honor. He has, and he's— So can we treat that as a final order? Yes, Your Honor. Yes, Your Honor. But without that, we could somehow treat the October 1 as a final order? Or we just read them together? It was our view when we noticed our appeal that it was a final order with respect to the privilege claim we were making. In the state proceedings, the court made clear that it was prepared and willing to look at a First Amendment claim with respect to specific documents, and that's what led to a process of in-camera review of documents and a further order rejecting our First Amendment claim with respect to the content of those documents. The court has taken out what we consider to be an erroneous view of the First Amendment protection, that it's limited only to the identities of rank-and-file volunteers and similar situations. That sort of gets to what Judge Berzano was asking. If—let's just assume, hypothetically, for now, that Judge Walker followed an NAACP case and applied the restriction as to names and that kind of information, and if that is the scope of the qualified First Amendment privilege, that would not be error, correct? You're arguing that the privilege has to go beyond that, as I understand it. So how did he clearly err? What is the—what do you rely on to say that the privilege is broader than the case authority, the Supreme Court case authority that Judge Walker invoked? Your Honor, what I'm relying on is other Supreme Court case authority, as well as authority from this Court. In the Dole case, the Dole against Service Employees Union, in which the Supreme Court and this Court— and the ACLU against Heller case—recognized that the content of communications are protected, of internal confidential communications. The Union members in the Dole case were apprehensive about the fact that the minutes of the Union meeting would be provided and disclosed to the government. But there we—but there didn't we wind—we wound up approving the governmental interest and said it was protected by a protective order, which is what Judge Walker entered here. Your Honor, that's true. A protective order was issued there, a protective order that made sense, whereas, Your Honor, actually it does not make sense here. If, in fact, my clients were being investigated, for example, by the FEC for some kind of a campaign finance violation, criminal campaign finance violation, that would make this case analogous to the protective order issue in the Dole case. There, this Court knows that there was a compelling governmental interest, that is, the investigation of the criminal conduct for disclosure of this—of what this Court held was First Amendment-protected speech. And the thing that was protected in that case was the privacy of that speech, the confidentiality of that speech, which would be compromised and infringed upon its disclosure to the government, the Department of Labor in that case. But the Court held that there was a compelling state interest for that infringement on the privacy and the confidentiality of that speech. Can I just go back to the question I asked you originally? The request for production says all—the original one, if I have it right— all versions of any document that constitute communications referring to Proposition 8 between you and any third party, including, without limitation, members of the public or the media. So why isn't this limited to that, our dispute? In other words, there doesn't seem to be a request for purely internal documents. Your Honor, in that request, you includes all the proponents individually and collectively. And so— Not just you being the organization that's the intervener. Your Honor, there has not been a dispute that I'm aware of or any misunderstanding among the parties in terms of whether communications, for example, between individual proponents or individual members, say, of the executive committee of the campaign, the Protect Marriage campaign, would be within this request. Well, would it make any difference with regard to a First Amendment privilege, whether—which was the case? Your Honor, we would submit that it would not be. That—and, in fact, Judge Walker made clear that the duty to disclose on behalf of my clients pertained to anyone who had a large role in the campaign itself. That included several of the proponents, actually not all of the proponents. The individual proponents and also—the third part of this that I got, I discerned from the story, was that he was also requiring production of communications between proponents and agents with persons who held managerial or directorial roles within the campaign, which means that individuals maybe who participated— does this mean individuals who participated in the drafting or were official proponents or unofficial proponents who were communicating with the campaign managers or the campaign consultants that those documents fall within the scope? Yes, Your Honor. Okay. I really want to know if the other side agrees with that point, so let me know when you get up, okay? In terms of what the scope was, what was ordered. This was handled substantially. We had argued that all of this was irrelevant, and it was wildly burdensome because it did comprehend every document that applied to any third party that related to the Prop 8 campaign. Let me ask you a kind of global problem that sort of goes back to the what's our jurisdiction problem. Insofar as it's not relevant, as you have a relevancy problem, we really don't have jurisdiction over that by itself. Do you agree with that? Except that it's wrapped up into the First Amendment privilege question. And we think it is— So that's a problem here because we—what I'd like to know is to what degree do you think it is wrapped up? In other words, couldn't we simply—isn't—wouldn't it be better if we simply assumed the plaintiff's theories, all of them, including strict scrutiny and everything else, and then asked, how does the First Amendment privilege apply, rather than trying to get into more discrete, substantive questions as they pertain to relevancy? Your Honor, I perceive your question to go to whether or not there is a connection between the merits of the underlying claim, on the one hand, and our discovery dispute on the other. Well, there is if we could do it the way you did in some of your papers and start deciding whether or not this is a rational basis or an intermediate scrutiny or a strict scrutiny. Can't we just avoid all that? And, Your Honor, we believe you have jurisdiction under the collateral order doctrine, even if you assume that the plaintiffs are right on what they are saying with respect to the level of scrutiny. Assume that it's strict. Okay. So the relevance determination insofar as it's wrapped up into the First Amendment determination would be made on that basis. We would say, Your Honor, that— That's an assumption without deciding anything. Your Honor, even if you assume that they are correct with respect to the standard of review, there is still a separation between our arguments because we believe, Your Honor, that our First Amendment privilege applies without regard to those issues. Let me clarify the other part then. That is the ultimate legal theory of relevance, if you will, is that voter intent, voter legislative history, whatever we want to generalize it, is appropriate to prove the invalidity of Proposition 8. That issue, as I understand it, is not before us. We're assuming that that methodology, that legal theory, is appropriate. The question you're raising is simply whatever the theory of their case is, they can't get access to your internal communications in order to prove that because of the First Amendment. Because of the First Amendment? Because, Your Honor, and this is intertwined with our First Amendment claim, those internal, private, never exposed— those messages and debates internal to the campaign were never exposed. That goes to a relevancy of a different order. I'm talking about we're not having to bite off the ultimate question that was mooted in the briefings about whether or not Judge Walker was correct about their legal theory, their overall legal theory. You do not, because regardless of how that comes out, this internal confidential information is irrelevant. Our submission is that the California electorate was not swayed by arguments that were not made to us. Your talking is irrelevant, and it may very well be, but it also falls within the standard of Rule 26, which is a step back from actually being relevant to the ultimate point. So I'm dealing with this discovery standard that's somewhat attenuated from what's actually relevant to proving voter intent. So, for example, there could be documents within the 21 that Judge Walker ordered produced that might lead them to something that perhaps was communicated or the reasons the particular message was communicated or was not communicated, and that would help inform the motivation for the voters. Your Honor, we agree with the amicus ACLU of Northern California's very forceful presentation that that standard ordinary discovery test of relevance would not be anywhere near protective enough of the First Amendment. If you articulate in a sentence or two what standard you think does apply, that is, how would you articulate the First Amendment privilege as it relates to relevancy? Your Honor, I would offer you the standard that was offered by the D.C. Circuit in the Black Panther case cited in our papers to you and reiterated by a district court in California in the Coors case, and that is that the information sought, the confidential private political communications sought, must go to the heart of the issue, must go to the heart of the issue. And if it did, then what? Then any First Amendment privilege would be overridden or interest or depending on the strength of the interest or what? Well, I think it would depend on the strength of the interest, but it would take at least that overriding vital relevance to the serious claim before the court. The Dole case, I would submit, is instructive on this. What compelling interest justified the compelled disclosure of those union minutes which were protected by the First Amendment because of their privacy, because they were confidential? The compelling interest there was the Department of Labor's investigation of crime and the acknowledged and undisputed reality that those minutes contained information directly relevant to that criminal investigation by a federal agency. And so it is that level of importance that is necessary to overcome the claim that this information, which was confidential and which was robust and unfettered, and robust and unfettered because of its First Amendment protection and protection in its confidential nature, could be forcibly disclosed by a subpoena in that case only if it satisfies the compelling strict scrutiny standard essentially. You're not arguing that. I'm sorry? In fact, you're not arguing for a compelling strict scrutiny standard. Yes, Your Honor. You are arguing for it. We are arguing that in order to overcome our claim that... That wasn't the Black Panther standard. You're arguing Dole now. Well, the point is that only if the information goes to the heart of a coverable claim can it possibly satisfy the requirement that disclosing it, compelled disclosure of it, is compelling. Well, it's a balancing test and you have to look at the strength of the interest on both sides. It is a balancing test, Your Honor, and in this case the strength of the First Amendment interest in preserving the confidentiality of those internal documents and debates and communications simply could not be higher. In fact, I would like to share with you these words from the McIntyre case. No form of speech is entitled greater constitutional protection than political speech. That begs the question because the question is protection from what? In McIntyre, they were trying to ban anonymous speech. They were saying you had to put your name on it. You couldn't be anonymous. And I don't think that translates directly. It may have some aura, but it doesn't translate directly to the question of, say, a disclosure of limited material under a protective order. It may be informative, but it's certainly not directly covered. Your Honor, I would submit to you that the rationale of the McIntyre case is precisely that. The identity there, the name and address of Mrs. McIntyre. But we've taken names and addresses out of the mix at this point, as I understand it. But the reason it was protected, the reason it was protected in McIntyre, was because it was no different than any other content of her handbill that she would decide herself to include or to exclude. This is what the court said. We think the identity of the speaker is no different from other components of the document's content that the author is free to include or exclude. If Mrs. McIntyre had edited from her handbill... This is several stages removed. No one was telling you what to say to each other, and nobody will be telling you what to say to each other if the discovery is allowed. The argument, instead, is that you will be influenced on what you say to each other in some future instance, as I understand it. If it is known that what you say to each other could become public. It's a strong argument, but it's a different argument. Well, it's a good argument. It's a valid argument, because we're not just talking about the Prop 8 campaign. We're talking about other campaigns, future campaigns, and asking ourselves the question of whether this district court judge, by holding that internal campaign communications are discoverable and when you're trying to ascertain voters' intent, whether that is correct, because if it is, he's right. I don't think he's right, but if he is right, then every initiative campaign that's challenged on equal protection and due process grounds in California or the Ninth Circuit ever again, and perhaps not even just issue campaigns, perhaps candidate campaigns as well, will be subject to the same kind of discovery. I think it's important, and I don't think you have to shy away from saying, yeah, the speech that already happened won't be tilled, but the implications that it's ruling if he got it wrong and it stands is going to have a much greater effect on campaigns, period. That is, Your Honor, thank you, the very essence of our argument, that in fact it is self-evidently true, we would submit, that if these private internal communications are subject to disclosure through ordinary discovery in post-election hearings, then campaigns in this state and throughout the country, really, will never be the same. Do you take the view that it's an inviolable privilege? Let's suppose that in this case the campaign managers, consultants, all of the key people who framed the debate had a very secretive meeting where they deliberately set out from day one, this is hypothetical, to mislead the voters that the evidence of their meetings, tape recorded, whatever, however that core evidence would reveal that there was a deliberate intent to mislead the voters and that the sole purpose of the proposition was to discriminate against gays and lesbians. Now, are you taking the position that under the First Amendment privilege and the chilling effect notion that even though that clear evidence of intentional discrimination and a bogus governmental interest on behalf of the initiative is inviolate and cannot be discovered at all? We are. We don't see how that information... Remember, the issue here is not the intent of the proponents or the campaign opposites. It's the intent of the California electorate. And again, that's what this court ultimately, presumably, will have to discern. And how can it be... But you're arguing with the relevance, aren't you? You're saying voter intent, but it has to depend entirely on what the voters... what was communicated to the voters. We're saying that information and material that was not communicated to the voters, we would say that can't sway those voters. Well, I guess the more subtle version of Judge Fisher's question would be, well, what if there was a secret meeting that said, if we say X, that is going to trigger Y discriminatory impact. And it is our intent to trigger that Y discriminatory impact on voters and to bring it to the fore and they will then vote on a discriminatory basis. And I think that's so far-fetched that there might be some focus grouping or psychological study saying, you know, this word brings out that emotion which then gets people to hate gay people and they'll vote on that basis. Suppose that was the secret meeting. Well, Your Honor, if that is the case, then whatever it was that the campaign, and this was a cacophony of voices, ours wasn't the only one, and it was intense and passionate and sometimes offensive. But, Your Honor, the plaintiffs and the voters were able to assess what was said. I presume that at this point at the trial they could get experts to look at the same stuff and say the same thing. That's precisely it, Your Honor. Right, you could get, for example, I don't know why you couldn't get the internal polling results and compare them to the timing of the scary, scare tactic commercial involving children and see how that affected the trends after that point. I mean, I don't see why you, what I'm saying is, this is an argument in your favor, that that would be discoverable. And I'm sure there was their own set of polling results that would show when that ad came down, and then you could have an expert opine that that ad was intended to elicit discriminatory attitudes toward gays and lesbians. Yes, Your Honor, and keep in mind, Judge Brizant, that in order to find, let's assume for a moment that that would be relevant to the question of the voters' intent as opposed to what was actually said and analyzing what was actually said. In order to find that needle in the haystack that is the private, confidential, daily communications, thousands and thousands of emails, in order to find that, the cost in terms of infringing the First Amendment confidentiality of those communications just couldn't possibly justify that kind of discovery fishing expedition. We do assume that there might be something like that in there. That is our submission because, first of all, its relevance, we think, would be at best tenuous and speculative. As far as I know, neither party has cited to us a case in which discovery of this kind ever happened. Do you know of any in which discovery of this kind was ever allowed? Do you know of any in which discovery of this kind was ever allowed? No, Your Honor, and we think that speaks volumes. We are aware of no case in which this type of internal confidential communications were discovered, and we are certain that there is not a case in the Supreme Court or from this court or any other court in which this type of confidential internal communications were offered as some kind of relevant proof to the intents of the electorate. None of the Supreme Court's referendum cases, even those involving claims of racial discrimination. But also, the parallel would be the intent of legislators under Washington v. Davis and Arlington and so on, but as far as I know, there are no cases in which this kind of discovery The non-publicly expressed intent of legislators has occurred either. It's allowed, in fact, in the Jones case. The Jones case is a very good precedent for that proposition. We are aware of no such legislative internal thought processes, and in fact, one of this court's mandamus cases, City of Las Vegas v. Foley at 747-1294, this court issued a mandamus in order to prevent a party from deposing city officials to determine their motives for enacting a zoning ordinance. And that's precisely the kind of internal thought process and communication. At some point, she seemed to be arguing earlier, not now, that the only thing you could look at was about statements and the language, but I gather that it's now common ground that anything else is fair game. In other words, the actual advertisements or newspaper reports or anything else, but not the internal documents. Frankly, Your Honor, yes. That is the issue. That's the line that this order we're bringing to you draws, internal versus public messages to the electorate. But frankly, Your Honor, I do not believe that those either are relevant to the intent of the electorate. But that's a later fight. That's a later fight. But it's instructive here. Certainly the California Supreme Court has viewed, in terms of what is relevant to the intent of the electorate in referendum issues, only the official ballot information. Because apart from that, how could anyone actually try to assess all of the messages? Even apart from trying to assess all of ours, again, the debate over Proposition 8, likely campaigned on public debate. What about Washington versus Seattle School District? The Supreme Court case, it actually concluded from statements of proponents that a facially neutral initiative was actually racially discriminatory. They did, the Supreme Court did, add to the already overwhelming evidence from the language of the proposition that is in Seattle Schools to its effect, to its position in Betty Washington's school code. All of those reasons made clear that the only purpose of that was a racially discriminatory purpose. And yes. It was the only conceivable purpose. The only conceivable purpose. They did consider the statements, public statements of the proponents. Public statements. Public statements, Your Honor. And frankly, I think those public statements, I could be corrected, but I think those public statements were the ones that were actually in the official ballot materials that those sponsors had put forward. I believe that to be true. I'm not sure. But the real point here is that there were public statements. Nowhere did anyone suggest that the referendum sponsors in that case, or any of these other cases, could bring forward internal confidential communications within a campaign, whether it was those who supported the referendum or those who opposed it. And that's another feature. Yes. I was going to just say, Mr. Cooper, that you're more than double your time. Yes. I think we should hear from the other side. We have questions to address to plaintiffs as well. Good morning, Your Honor. Thank you, Your Court. I would like to begin with the last point, Judge Worley. You mentioned the Washington School District case. And it's striking to me that in that case, not only did the Supreme Court rely on things that were outside the record as a completely facial neutral law, but in reviewing that case again last night, I noticed that the court mentions there was a nine-day trial in that case in the district court. And the district court's decision talks about all kinds of findings. It's at 473 F-Sub, page 1009, 1010. And the district court walks through these findings that were clearly based on things that involved internal discussions among the supporters of the initiative. So the Supreme Court made very clear in that case that in terms of finding purposeful discrimination in intent, things beyond the pure public record would be relevant. Mr. Cooper conceded that there is no case anywhere, and this court's jurisprudence is anywhere in the country, that allows an interlocutory appeal of this sort of First Amendment privilege issue. I don't call it a case of preclusion. I don't know. I'm not sure he conceded that. I mean, there's no case that has raised this particular issue that a court has actually ruled on it. So, all right, it's a case of first impression. And I think, number one, that's a reason to reject the interlocutory appeal here. Number two. Can I just understand as a practical matter why we shouldn't address and clarify or validate, whatever it may be, the First Amendment privilege issue in this case? Why does it make sense to go through an entire trial if Judge Walker is wrong and has, therefore, compelled disclosure of and presumably would rely upon information that ought not to have been made public? Okay, so it goes all the way through trial. Let's suppose that you lose and, therefore, the proponents, having disclosed the information, have no incentive to appeal. So what then exists is a, and I'm just being hypothetical, but now comes a trial that was conducted under an erroneous First Amendment privilege standard. Documents were disclosed. There is no definitive appellate court ruling on it. And the chilling aspect that that order might have goes unreviewed and irremediable until maybe some other case in a different posture or whatever posture might allow it to be challenged. What is it that is prejudicial or not in the interest of proper judicial resources and not interfering with the trial judge's discretion? All of those things that one worries about on interlocutory appeals of discovery orders. Why isn't this case, given the novel issue and the importance of it, one that shouldn't be addressed now and definitively by this court so that nobody is wasting their time? Well, first of all, Chief Judge Walker applied the correct legal principles, the Dole decision, and I'll come back to that. But to answer your question, in the next case, a litigant would make the arguments Mr. Cooper is making, that Chief Judge Walker was incorrect and that does not bind the next court if there's not an appellate decision. The Dole case does not hold what Mr. Cooper said. It did not hold that there was some heart-of-the-matter test. That's the reporter's privilege test that was touched on by the Black Panther decision in the D.C. Circuit, which was vacated as moot and had no precedential effect. In Dole, the court said... I thought it was interesting that Skelly Wright got cited in this case. He wrote the reporter's privilege case in the D.C. Circuit as well, and he drew on that, but that case was vacated. The test in the Dole case is whether there's a compelling interest in the discovery, and here I must disagree with Mr. Cooper. Individuals who claim that their fundamental constitutional rights have been violated and are seeking to investigate the claims to build their case have a compelling interest in the discovery. At a minimum, this discovery, it seems to me, is going to be very peripheral, whatever it turns out. It's hard to see how it's other than peripheral. Can I give you an example? Yes. We submitted today a 28-J letter. Well, that makes it more peripheral. That makes it more peripheral. Now you've got it in public, what do you need it on private for? We have one document. Mr. Tam was being deposed today, and he said he viewed this as a private document because he had sent it to how many people we don't know. I don't think you can call anything that's on the Internet private. Mr. Tam did today, and he refused to answer questions about the document. We'll see what happens there. That's his problem. But, Your Honor, we don't know how many other documents there are that do something along the lines, and again, I don't know, but there's a certain level of discovery on relevance, and Mr. Cooper said he wasn't talking about relevance, then he said he was talking about relevance. Under Romer, the court talked about animus, improper motivations relating to the law that's being challenged. Was that based on internal campaign strategy that the Supreme Court was able to reach that conclusion, or was it based more on, and I wouldn't confine the test as narrowly as that, but really the ultimate effect in context, in that historical context, in that case, if someone was enjoying a ride and it was taken away, what else could be the motivation? Well, that's the situation we have here, Your Honor. So why do you need those documents when you've got this same situation here without those documents? I think, Your Honor, Chief Judge Walker wants to make clear, he said this in his court, that we have the fullest possible record on the facts for this court and the Supreme Court when this case, if and when it's reviewed. But there are some competing considerations, and do you have any case, you say that in the Washington School case, the Supreme Court opinion does not reflect reliance on anything other than publicly available documents. You say that the district court opinion does. I have not looked at it. But is there any case that has specifically allowed discovery of this kind? Any case? Your Honor, not that I know of. Other than, to the extent you can discern it from Washington School District. But there are these cases that involve First Amendment inquiries. In fact, all discovery, or most discovery of civil cases, involve requests for confidential speech. And it is not plaintiffs who are asking for a new broad rule. The proponents are asking for a First Amendment privilege that would be broader than the reporter's privilege. It would be broader than executive privilege. It would be an absolute ban on any inquiry into anything that related to the communications to the voters and the themes that were used. Okay, let's assume that. Let's assume that they are seeking something that's overbroad in your view. In the November 11 order, Judge Walker seemed to use a properly applied goal in the other cases. But it seems to me that the November 11 order seems fairly definitive. That he has restricted the First Amendment privilege. If it applies at all, I think he said, at most it protects the names and identities of the authors of these statements. And that I can deal with by a protective order. Now, what is the authority that says that that is all that the First Amendment privilege definitively says? That that is all that the First Amendment privilege covers? Yeah, that's certainly the core of it. Maybe the core. But I'm a strong First Amendment advocate, and I agree that other First Amendment interests will come into play, as in the Dole case. But Chief Judge Walker went farther, Your Honor, Judge Fischer, than you're suggesting, I think. He found, he looked at the First, implicitly at least, and he had already ruled and applied the Dole case, that there had been no showing of harm that would have resulted from these disclosures pursuant to a protective order. In part because Mr. Schubert, the campaign consultant, wrote an article. Let's take harm out of it. Let's talk about chilling effects. And then on chilling effects, Your Honor, Judge Chief Judge Walker applied a balancing. Documents after documents, meticulously went through 60 of these documents and found that if the nexus was not close enough between the messages actually conveyed to the voters, then the documents would not be required to be produced. But what standard was he applying? He looked to me as if he was applying Rule 26, likely to lead to discoverable evidence. That's a much, much broader and looser standard than any kind of First Amendment chilling effect standard. But, Your Honor, that's the correct standard. That's the question. That's the question we're exploring, whether that is the correct standard. I believe it is, Your Honor. The test that the Dole case applied was whether the information sought was rationally related to the compelling interest that was being invoked to pursue the information. Yes, but you're weighing it against, under Black Panther and the balancing test, the harm, the chilling effect harm to the person being compelled to disclose. That is not a Rule 26 balancing test. That's right. That is just reasonably likely to lead to discoverable evidence. And so in the path to the discoverable evidence, you're requiring disclosures of the kind that might, indeed, probably will have a chilling effect in the future. Well, Your Honor, the protective order, first of all. How does the protective order do it? Once the disclosures are out there, anonymous or not, it says that, look, if we have these candid discussions, if we go back and forth, they'll excise our names from it, but that kind of debate, internal debate, will be out there, and that's not the kind of thing that I want to be out there, therefore I'm going to find some way not to communicate it or resort to underground methods or whatever. Your Honor, I think that the kind of showing this required objective, ascertainable facts, that was the test the Dole case laid out, that standard has not been met here in terms of the chilling effect. Mr. Schubert said they might communicate a different way. He wrote an article extolling the messaging strategy, talking about their internal polling, talking about their grassroots campaign. That seems kind of like a waiver argument to me, not a what is the correct standard. Yes. And certainly now that he's got this public article, I would think you'd be able to depose him about the article. But that doesn't, to me, bear on things that were not made public. Your Honor, I think the proper standard is the standard that is laid out in the Dole case, which is first there must be specific, concrete demonstration of power. There, there were declarations that said, I will not go to any more than that. Well, first of all, the Dole case was dealing with a government investigation into criminal wrongdoing. And, I mean, this gets to the centrality question. I mean, here you have an instance in which the subjective motivation of the campaign individuals is at least several stages away from directly relevant to the issues in the case. It may meet a Rule 26 standard, but it's sure out there. Why doesn't that matter in terms of trying to take Dole and just use it? That's exactly what Chief Judge Walker did, Your Honor. He said the subjective motivations and thinking of the proponents were not discoverable. The only thing, I think the November 11 order very carefully establishes the standard. It was only communications and material that were related to the messages conveyed to the voters, which goes directly to the point concerning the motivations of the electorate. But the messages that were conveyed to the voters are independently available. They are, those are available. So why it matters what was said about the messages that were conveyed to the voters is, again, pretty peripheral. Well, Your Honor, I mean, again, the Tam document, which we submitted today, we would never have had it. Mr. Tam said he didn't know people would post it on the Internet. The proponents had taken the position that the document was transmitted to hundreds of thousands of people saying that the reason to vote against Prop 8, as he does here, is to avoid California and the rest of the country falling into Satan's hands. And those are the, he lays out the reasons he is communicating to a whole wide group of people. Proponents are not producing that kind of information, and this document happens to get out to the public. But they're not producing something that they actually sent out to people. Then they're violating the discovery request for other reasons. It has nothing to do with the issue that's before us today. It does, Your Honor. Why? The position they're taking is that these documents are covered by the First Amendment because they were communicated to people with whom they have an associational bond. So Mr. Tam, he has a declaration in the record. He talks about how he was the leader of a coalition of Asian churches. So apparently, under his theory, and he's a party to this case, communications to no matter how many people, where he's telling the electorate to go out and vote, it says, unless it's passed, the next step is sex with children. Those were the messages. You can make a very, so if the, it was understood that any document that went out to vote with quad voters was not covered, that would eliminate the problem, right? Well, so far, the issues that, the way that it has been framed, the First Amendment privilege, is any document that proponents deem private in this manner, they are withholding. We have no idea what those documents are. Well, that is simply a question of defining the scope of the internal circle that we're talking about. All right. That does not appear to me to be the core of the issue that's before us today, and maybe that's something you have to hassle out at the district court if these things aren't getting discovered when they should have been, because they were, in fact, going out to a wide range of people in their capacity as voters, then there's the sign of discovery, or that's a different problem. But I was, I was. But would you, would you answer my question? So, because this is related, my understanding is that, my understanding is that document should have been produced, because what you're fighting about here is communications between proponents and agents with persons who held managerial or directorial roles. And the group that that document seemed to go to was not limited to those in control of the campaign. It was going much more broadly. So that is not even part of what we're arguing about. That's incorrect, Your Honor. Why is that incorrect? Because the position that Mr. Cooper took before Chief Judge Walker, and that they're taking to this day, and that Mr. Tam, who's being deposed today, has taken, is that communications with individuals with whom they have an associational bond are private and not discoverable. I don't see how that's correct at all. I also don't see how that is within what we're discussing today. Those documents are being withheld from us. Right now we have a trial scheduled for January 11th. The depositions are taking place with the proponents. And under the balancing task, we're seeking documents that relate to the messages that were conveyed to the voters. And I think, Judge Fischer, your example, I know you were giving an extreme hypothetical, but if there are communications that explain, here's how we push the buttons to animate hostility towards gay men and lesbians, that would be highly relevant. And the judge has balanced this. I think he did a very commendable job of coming up with a standard in this November 11 order. He walks through the documents. The third category on page 8 of the record excerpts where he says, even though some of those documents under the Rule 26 standard clearly would have been discoverable because they relate to messages ultimately adopted by the campaign, he says they're not to be produced. So I think he has drawn a line, Judge Wardlaw, that is a balance. And it's a case-by-case balance, which, again, is why this should not be an interlocutory appeal. It's enmeshed with the merits. Well, I assume you're going to take this TAM document back before Judge Walker and get a ruling on what's public and what's private, right? That will happen. And he has also indicated he's going to consider proposals on the protective order today and then issue a protective order that will protect these First Amendment and associational interests. That's why, as much as I like being here in the Ninth Circuit, I think it's premature. Are we talking about a protective order, or are you now talking about a protective order with regard to redactions or a protection order with regard to attorneys' eyes only? My understanding in reading what Judge Walker was saying about that was that he was proposing that essentially while the appeals are pending in order that the discovery could go forward. Your Honor, we have agreed, and as Chief Judge Walker has contemplated, a protective order that would govern throughout the case. And the question would come, to be fair, once we determine which, if any, of the documents we would use at trial, how, as a case management issue, Chief Judge Walker would deal with that. But it's a bench trial, so he has much greater authority to balance the associational interests, the First Amendment interests, the needs of our clients to get information to prove and demonstrate. So your understanding is that what is being contemplated now is not just a short-term, not what was true before. Because before, as I understood it, what was argued about at the district court until now was simply a short-term protective order to get the discovery going so that the trial could go forward in January while this proceeding is going on. That was, I think, the early discussions, Your Honor. Now the proposal we're going to make will be an attorneys' eyes only protective order. And I believe there's a provision that would allow redaction of individual names who are not in the management circle before the documents are submitted, even under the attorneys' eyes only provision. We are sensitive to these First Amendment issues. There's no question about it. Chief Judge Walker has been sensitive to these issues. And this is an extraordinary situation in the sense that we have a ballot initiative that was voted in to strip away the state fundamental constitutional right to marry of individuals. And we have proponents who are trying to offer rationales for it. If ever there were a case where discovery was warranted, it would be this one. Here's why. But there has to be a myriad of situations in which the internal deliberations of campaign functionaries are at least as relevant to what the litigation is here. Do you disagree with that? There could be other circumstances where it would be relevant, but it would be for the district court applying relevance principles and interpreting the constitutional standards and making merits determinations about what is relevant. That's why this is an inauspicious appeal. It's inappropriate. These issues are completely enmeshed in the merits. Even though Mr. Cooper said he wasn't challenging relevance, he then did repeatedly during his argument. But if I can go back to my point as to why here it's particularly relevant, one of the principle rationales being offered by the proponents in court as to the purposes behind Proposition 8 has been to protect the traditional opposite-sex marriage institution. When Chief Justice Walker asked Mr. Cooper what harm would come from recognizing same-sex marriage, he said he did not know. And it seems to me that when the proponent's lawyer does not know the rationale that supports the law, then we're entitled to find out what other messages and what other reasons they were using. It's the last sentence that I have a hard time with. You already have that. You have whatever is public about whatever was said about how it would affect traditional marriage. You have experts and data and so on to demonstrate that it doesn't make any sense if that's the case. What is added by knowing what people in the campaign said to each other about that? Well, as Chief Justice Walker pointed out, what was not said or decisions that were made about what to say may shed light on the fundamental purpose and objective behind the law. But it's the voters' purpose in voting for the law that we're looking at. Correct. And that's why I think the judge made the test whether the communications that were being sought had a sufficiently close nexus to what was actually said to the voters. Because we agree with you. And he ruled out simply what the proponents themselves thought and what they were thinking and what motivated them. But why isn't it much more relevant in that regard to look at what was actually given to the voters and to be absolutely scrupulous that everything that went to voters is discovered and then to have experts in communications and in behavior and in the psychology of campaigns look at that stuff and tell us what was going to be gotten out of it as opposed to what went into it and what came out of it? Well, Your Honor, I can't tell you because I don't know what all the documents are. But one of the things, again, this goes to a really fundamental feeling in this Court's Burlington Northern decision on mandamus. The proponents did not submit a privilege log originally. They did eventually. For the 60 documents that they picked out as examples. And I obviously don't know what those documents are. But I don't know what all the categories are. We have no sense of what they are. Now, there could be extremely helpful documents that would shed light on it. I think this document for Mr. Tammy. I suppose you can insist. Maybe it's something we should consider. You can certainly insist on a privilege log because anything that we, any line that we draw is going to have to be enforced. Something's going to be on one side of it and something's going to be on the other side of it. But that's sort of a procedural and different question. But that goes to the question of the type of privilege we have here, which is a balancing. Well, I know. I mean, you keep calling it qualifying. I think that's inapt, really, because it's a privilege that is weighed against the interest on the other side. But we also look at the least intrusive means of getting this. And I guess another question I have is I understand that there's third-party subpoenas going out. You know, why don't you subpoena Archdiocese of Los Angeles and get all their documents that went out, and all the organizations that were putting leaflets on people's cars while they were in church? I mean, there's so many other ways to get this material. Well, that would raise First Amendment issues as well, Your Honor. Those speak into that. I don't understand why. It would be publicly disseminated in public venues. Exactly. I mean, in the public documents, you're right, and we are seeking those sorts of public communications from other groups. But here, these are the official proponents, and this goes to the map. But here's the specter of all this. According to the ACLU, they understand that if this is allowed to go forward, then they're going to start getting subpoenas asking for all their internal documents. Presumably, you could then go to the Catholic Diocese and to the Mormon Church and so on and ask for all their internal documents. And where does it stop? Well, I think that goes to the balancing, Your Honor. Why? Well, the First Amendment test requires a balancing. Well, I understand that, but if the ultimate question is what did the voters think or what their motive or animus was, then all of this is equally pertinent. It's all very pertinent, Your Honor. That's true. So why couldn't you go to the – why is it more or less relevant because this particular organization is the one that intervened in this case? Why can't you go to the LDS Church and to the Catholic Church and so on and ask for everything they said to their congregants? Not everything they said to their congregants. Everything they said to each other about what they were going to say to their congregants. One, we haven't done that, Your Honor. Two, these are the official proponents of Proposition 8. They took an official status. They drafted Proposition 8. They then subjected themselves to disclosure laws in California. They subjected themselves to disclosures of their identity, their disclosures and responsibilities that they took. So they're in a very different position than the organizations you mentioned and Mrs. McIntyre in the McIntyre case, who the Supreme Court noted was acting independently as an anonymous leafleter, which is completely different than this situation. But what's the limiting principle in Judge Walker's November 11th court? What is the First Amendment limiting principle? The First Amendment limiting principle, Your Honor, would be that, first of all, there must be a showing of harm, this is under Dole, from the specific revelation of the specific documents at issue. Assuming they meet that prima facie burden, then the question under Chief Judge Walker's ruling is, is there a sufficiently close nexus between the documents that are being sought and the messages actually conveyed to voters? And the reason that that is a relevant nexus is because that is what we're trying to determine. And as Judge Walker put it, the mix of information may help us refute the alleged rational basis that's being put forward, demonstrate if Judge Walker determines that the higher level of scrutiny applies, that there's not a sufficient connection between the interest being asserted. And so all of that could be very helpful. I can't stand here today and tell you that it's going to be the crucial piece of evidence. We think we have really strong arguments in this case, but it would certainly be very helpful, and we believe that there are compelling reasons to allow this discovery to go forward. So when you say the nexus, you're relying on his statements where he's rejecting some that is not responsive, such as the documents do not discuss voters or their potential reactions. Correct. They are not responsive. So that's the nexus. That's one example, Your Honor. What's another? The relationship to messages or themes conveyed to voters is attenuated enough that it is not responsive. Correct, Your Honor. Which is under a Rule 26 standard, not a First Amendment standard. But I do think the materials on page 8, the one about voter reaction, under a Rule 26 standard, we would be clearly entitled to that if there wasn't some infusion of the First Amendment balancing test. And I think that his earlier orders also talked about the fact that the line being drawn was the connection to what was actually said to the voters, so we can determine what the purpose behind the law was. And I think that's a fair test. And I think a weighing of the degree of... Again, as a non-secretary there, what is the relevance of the purpose of the people who sent it out to the voters ad that's separate from what the voters perceived or thought or took from it? Well, in part, Your Honor, that is admittedly something we won't be able to find out what every person who voted thought. But you can, in some global sense, as I said before, get expert testimony... Yes. ...about the likely perception of ordinary people or the targeted people and so on. That would be one form of evidence, but we think that there are other compelling forms of evidence potentially available. That's why we would like this discovery. The protective order protects it from public disclosure. Going back to the points that were being made earlier about the ability to deal with the chill, a subsequent appeal would address that. If the appeal happened after the case and we won and proponents appealed, that would allow this court to then determine whether this was appropriate and would minimize or eliminate if there was some improper chilling effect. Can I just go back to what I asked at the beginning? Yes. Your original request, which I read, seemed to be talking about third parties. What is your understanding of that? We think that, Your Honor, as you'll recall, Judge Walker said that was too broad and... But that seems to me to be narrowing in some sense. That is that you were... I took from that that you are not looking for, and it would not be responsive to produce documents, e-mails between one person in the intervening organization and another person in the intervening organization. Is that not so? That is not so, Your Honor. Because why? Because the managerial employees, we've narrowed it down to that, communications about what messages to convey to the voters we believe are relevant in determining... But they don't seem to be responsive to the request as you posited it, because the way you posited it, it only dealt with third parties. That's what I'm not understanding. But under Rule 26, those would be communications that could lead to the discovery of admissible evidence that may be relevant. But you didn't ask for them. You only asked for communications with third parties. That's what I'm missing. Yeah, I believe you asked for communications relating to, which would encompass in how we define the discovery request. This is what it says. All versions of any documents that constitute communications referring to Proposition 8 between you and any third party, including without limitation members of the public or the media. Am I reading the wrong request for production? That's correct. So how does it apply, just the way you posed it, to internal documents? I mean, this helps you in a way if you really want the internal documents. But it doesn't seem to refer to internal documents. Well, I think there was, Mr. Cooper alluded to this, a debate about what you meant and who third parties were. We have since reformed it to really track what she says Walker on page... All right, so we should have scratched that out. That's not the controlling document. We've moved beyond that, Your Honor, and narrowed it. Communications to third parties, and this again goes back to this CAM document, which we submitted today. In a normal case, if someone withheld documents that they sent, and just said we're not going to produce, we're not going to do a privilege log, we're not going to produce documents that we sent to thousands of people because we think we had an associational bond with those people. We're not going to tell you what those documents are. There would be sanctions. That's apparently what is going on here, and this document that we discovered suggests that's true. And so just to go back to the basics here, it looks like I have now blown through my time. I have one final question. Other than what you mentioned, the district court case in, I think, the Seattle, the district court opinion in the Seattle case, has there ever been a case that was an inquiry into voter intent on an initiative that looked at anything internal to the campaign itself? Not that I've seen, Your Honor. And again, this is an unusual situation, but not that I've seen where the judge has said we're going to try these issues, we're going to look at these facts, we're going to stop having a battle of the experts. Many of these cases involving marriage that have been happening have been held at summary judgment where one expert gets up on the stand and says one thing, another says another, or they don't even get up on the stand. It's summary judgment. And Chief Judge Walker said here, let's look at the facts. Let's get to the bottom of these issues one way or another. In terms of stopping points, if this discovery is allowed, why in any case in which somebody alleges that a legislature was enacting something with a racial motive or a sexual motive, a sex discriminatory motive, in order to meet their standard under Washington v. Davis, can they take depositions of each legislature and ask them about their personal motives? Why not? And all his communications with his staff about why he voted as he did. No, Your Honor, I think the speech or debate clause would preclude that, and I think the cases are clear that the individual legislator's motive is not pertinent. We're not saying that the individual voter's rationale and motivation, we can't tell, we can't count everyone up. We're trying to make a good faith attempt to make a reasonable approximation and make a record that the judge can look at to determine what really is the purpose and rationale. What about, let's suppose the caucus, the Democratic or Republican caucus commissions an ad campaign, health care, whatever you want to make it to on the abortion issue, whatever, pick some controversial or target gaze or whatever. Would that be outside the speech and debate clause? It could. That component of public endorsement that wasn't something that happened in the floor of the Senate or wasn't in the scope, it's a fairly broad privilege, though. The speech and debate clause has been given so much. So you would say that unless the speech and debate clause is an independent limit, that would be fair game because that would be insights into how the caucus was manipulating the body politic to bear the weight on the legislation. That might fall closer to where we are here. Again, the individual thinking of the legislator, but it might have been a mechanism to motivate Congress by getting people to call in and call their member of Congress. So it was a way to, analogous to this case, mobilize people. So it might be a much more analogous situation. If an individual senator, for example, decides to undertake that on his or her own and commissions that kind of activity, you think that that would be fair game on legislative intent to show that? The information might be, but I think there would still be very difficult hurdles for us to get over in terms of the legislation. Is there any case that's ever suggested you could go after individual legislators to start picking up those things connected with the messages or things communicated in order to influence the ultimate legislation? Not that I've seen none. I think we're not pushing for that kind of rule. We're asking for narrowly targeted discovery relating to communications to the voters that would shed light on the factors in Wilmer, in Washington versus Davis, and the Seattle School District case in terms of whether or not this was purposeful discrimination. And we think that Chief Judge Walker's created a mechanism that balances the First Amendment interest against the compelling need for our clients to investigate these issues. And we think that there's no jurisdiction because these issues are wrapped up in the merits. And on mandamus, let me just say one last word. If anything is clear, the right that's being asserted here is not clear and indisputable. It is murky, difficult. What does clear error mean exactly in the mandamus context? I don't understand it to mean, well, first of all, it's not disclosure. But second of all, it doesn't mean, I assume, what it would mean in a qualified immunity case, for example. At least there's no obvious reason why it should mean that. We're not trying to preserve the authority of federal judges to act freely, are we? Is that what we're trying to do? Trying to preserve? In other words, what is the function of the clear error provision of the found intent? It's really to avoid the fundamental reason is to avoid judges going beyond their power and beyond their jurisdiction. The original intent was for extreme, extraordinary, over-the-top violations. Then another standard is whether the issue is novel. So they're cutting in opposite directions. And a third standard is whether it's an off-repeated error. So it seems like the different standards are running off in different directions. You know, those two standards, I think, this Court has added as a gloss to the three tests, three-pronged tests that the Supreme Court recently in the Cheney decision articulated. And the dispositive factor, if it's not a clear and indisputable right, there can be no mandamus. And that's what this Court held in the Burlington Northern decision interpreting Cheney. So a lot of those other factors can be relevant to the discussion. Isn't the Las Vegas v. Foley case pretty close in on the mandamus question? I believe that was with the city council members. And there you had clear law saying that the intent of the legislatures was not fair game, if I recall. But there's no speech in the debate clause. It was a First Amendment privilege. But I think that the view was that as a First Amendment matter, it wasn't a debate here about the kind of First Amendment test that would be applied. And none of the cases, Your Honor, cited by the ACLU, cited by the proponents, suggest that there's anything other than a balancing test, which is what the judge applied. But why is the Las Vegas v. Foley issue any different? There you're trying to get at the motives of legislators. And here you're trying to get at the motives of the voters. You're doing it by getting – you're not doing it by interrogating the voters. You're doing it by interrogating other people who have their own First Amendment interests. So what's different about it? Well, I think, Your Honor, here, the big difference is that very difference, that with legislative activity there's a more fulsome legislative history, and Chief Judge Walker mentioned this, where one can have a better record to define what the purpose of the law was. I hear you have 40 or $50 million spent putting out pieces of paper. The pieces of paper exist. They're out there. I think the distinction between the legislatures and the voters is a significant one. But I want to just correct one thing I said about other cases. The South Dakota Farm Bureau case did involve the inquiry and discovery and analysis of confidential documents and communications that the Eighth Circuit held was something to rely on in determining the intent. It also considered relevant the drafters' intent, right? That was the case about the drafters' intent? I believe that's correct, Your Honor. But we don't think that's relevant here. We think it's the voters' intent. The drafters' – well, we think that's correct. I mean, Chief Judge Walker narrowed it even farther. Theoretically, we could have argued the drafters' intent was relevant. The Eighth Circuit case is a little bit of an outlier on that. But it's one of the few cases that actually has decided this issue, and I think even potentially broader. And back to the Foley case, Your Honor, that was a case where the legislature's intent was a zoning decision, I believe, and it wasn't the situation where the inquiry was, was there purposeful discrimination by the lawgiver? I thought that was the question. I don't think so. There was a zoning, an asserted racial zoning. I'm not sure. I apologize for – Why don't we deal with it? Can I come back then on the collateral order point? You've been talking about the November 11 order. It sounds to me you're treating that as a final order. No, Your Honor. It's not final in the sense that – You've laid out all the parameters. He laid down the standards that would govern the balancing going forward as to documents. So why isn't that a final order? Because there are other documents we would – Well, that may be as implied, but in terms of looking at the final order of discovery, it's clear that he has rules on what it is and what its parameters are. I believe it's not final, Your Honor, because it is not separate from collateral to the merits, because it links to the question of relevance of the documents to the merits claim. But he's applying a Rule 26 standard into that. I'm not sure. Well, but it's final as to the 21 documents he ordered produced, isn't it? Well, I mean, we still have the protective order, the production of the documents. But that's probably going to the identities and – I mean, as to those – the substance, the content of the 21 documents that he ordered produced is final. He's made a determination. He said what the standard is, and he said you're going to produce those documents under that standard. I'm resisting the word final because that connotes something that is appealable, but it's not final to those documents. He has decided those issues. You're correct, Your Honor. And so he has decided that those documents must be produced. I mean, he's not going to hold another hearing on these documents. Correct. That's correct. So it's conclusive as to those documents, but not the other documents. And it does narrow and lay down standards for production that we think are consistent with the First Amendment. And we would request the Court dismiss these appeals and deny escape. Thank you. All right. You have used that almost exactly the same amount of time. Mr. Pepper, that's pretty good. My internal clock is very good at being here. Thank you very much. All right. Thank you very much. I did say you could have it brief, but take it very, very brief, because you've already done – you have a couple points. Your Honor, I will digest that, and thank you very much. First of all, with respect to mandamus, the five factors in the Bauman test are not all mandatory. And, in fact, if you satisfy the fifth factor, that is that it be a new, novel, and important question of first impression, it's difficult to see how any decision could necessarily be clearly erroneous. We definitely have a very important question of first impression. But this document, which was handed to me an hour before the oral argument. Your client should have handed it to you sooner. Yes. Well, Your Honor, I don't have the explanation why it hasn't been produced. There were thousands, tens of thousands of documents in this case. It's your client's document, so what's the point? Well, the point is it is not within my claim of privilege. Make no mistake about that. It's on its face, a public document on a website, signed by Mr. Tam in his capacity as a member or a leader of a different organization than Protect Marriage and this campaign. So, I don't know what its status is apart from the fact that it is not within my claim of privilege. Okay. It may not have been within your client's control. I honestly, I've never seen this document before an hour ago. I will obviously get to the bottom of it. But the central point is Mr. Boutros is wrong. We're not making a claim of privilege. This is not an internal document. It's true for that reason that the only way this is going to be a governable situation is if you produce a complete privilege law. How else? Let's assume you win in some respect here and there is a line drawn that is different than the one that Judge Walker drew. There's still a line to be drawn and somebody needs to make judgments about what's in and what's out of it. You're right. That's a fair point. But we think that the line between what is public and this document seems clearly on the public side of that line and what was internal and private is not bright. But it is a line that I do not believe would require us to actually produce a privilege law for tens of thousands of documents. That in itself would be a requirement so extraordinarily burdensome on any litigant or any of these third-party subpoena organizations to cope with. That may be a different reason for not doing it. But it can't be the First Amendment privilege because I don't see any reason why the First Amendment privilege is going to be different than the attorney-client privilege or any other privilege with regard to the procedural protections accorded it as opposed to the substantive protections. Your Honor, my response to this is that, in fact, the burdensome nature of involvement in a discovery dispute and post-election litigation over a referendum could well have a profoundly chilling impact on the willingness of, for example, the campaign consultants to get involved in this. The resources necessary to engage in this discovery battle have been and will be enormous. The final point quickly I'd like to make, Your Honor, is this notion that the plaintiffs stand essentially in the same shoes as the Department of Labor did in its investigation of the Union of Criminal Activities. Well, now we're just repeating, and it's also in your paper. So I think we'll just adjourn this session of the Court. Thank you, Your Honor. Thank you very much. Thank you both. We'll argue on both sides.
judges: Wardlaw, Fisher, Berzon